[Crim. No. 2316. Second Appellate District, Division Two.—April 25, 1933.]

THE PEOPLE, Respondent, v. JOHN ROBERTS, Appellant.

Edwin S. Douglas and Albert E. Coger for Appellant.

U. S. Webb, Attorney-General, and Albert Belford, Deputy Attorney-General, for Respondent.

WORKS, P. J.—Defendant was found guilty of murder. The crime was a filicide. That defendant shot his son to death was undisputed. Under his plea of not guilty the sole defense was that his action in firing the fatal shots was committed in self-defense. He also entered a plea of not guilty by reason of insanity. He appeals from the judgment and from an order of the trial court denying his motion for a new trial.

It was the theory of the defense that appellant, on the day of the killing and pursuant to previous engagement, walked into the business office of his son at a time when the latter

was using his telephone, that the son then, without relinquishing his hold on the telephone receiver, pointed an automatic pistol at his father and pulled the trigger, but that the weapon snapped and was not discharged, and that appellant then shot his son down.

The first contention made by appellant is that the trial court erroneously denied him the right to introduce evidence showing a feeling of animosity toward him by his son, persisting continuously and for a long time before the day of the shooting. It is said that this evidence, if permitted, would have sustained the theory that the son snapped his pistol at the father, thus in turn supporting the theory that the father shot the son in self-defense. The question thus presented first arose in this wise, premising that the killing occurred on July 26, 1932: At the close of the evidence presented by the prosecution, counsel for the defense made a preliminary statement to the jury. Immediately after the commencement of the statement counsel for the defense said: ''We are going to show to you that this defendant left his first wife and two children, one of whom was Earle Roberts [the decedent son], in 1893. . . '' At this point counsel for the prosecution interrupted the statement with the remark that ''the People object to any such proof on the ground it would be immaterial, and therefore to any opening statement in that regard''. The respective counsel then approached the bench for the purpose of discussing with the trial judge the situation thus presented, and a somewhat lengthy colloquy then and there occurred out of the hearing of the jury. During it, although, strictly speaking, the time for the introduction of evidence on the part of appellant had not yet arrived, the judge permitted his counsel to make an offer of proof. The offer was thus couched: ''Well, we offer, then, to prove that the defendant was married, had two children, one of which was the deceased, Earle Roberts; that the defendant left his wife and children in Chicago, Illinois, about 1893, and went to St. Louis. He there accumulated about $2,000 and came here to California and became a successful contractor; that he then went back to Chicago and educated his son, Earle Roberts, and built a home for the first wife, she having married again; that after his son's education was completed in Armour Institute in Chicago, he then brought the son to Cali-

fornia and took him into business with him; that the son's mind had been so poisoned by the mother and by his consideration and analysis of what he thought had been a great wrong to his mother that the son's purpose was to avenge his mother's wrongs on his father; that subsequently he made statements to that effect." The prosecutor made objection to the offer and said, in addition: "The People will not object to any offer of proof of any statement on behalf of the deceased against his father in the nature of threats to do bodily injury." The court then ruled, with italics supplied by us: "I think the objection is good. *Of course, at a later time, as your defense develops, I might see your point of view, but at the present time* I think I will have to require you to limit your proof to threats." Counsel for the defense then proceeded to complete his opening statement to the jury.

The court ruled correctly in sustaining the objection to the offer of proof. There was much in it which could not possibly have been material, and unless the whole offer was proper the objection was of course good. If we assume something it seems not necessary to decide, that is, that the trial. judge was wrong in saying that "at the present time I think I will have to require you to limit your proof to threats", we must at once remark that the observation was not final. What we have italicized above from the judge's entire statement sufficiently demonstrates the truth of the assertion. The only then present effect of the judge's ruling was to place a limitation upon the opening statement of the defense to the jury, and it is not contended that from that aspect appellant was harmed, nor, indeed, that the imposition of the limitation was error. All question as to the *admissibility of evidence* concerning the matter as to which counsel sought to address the jury was left open by the trial judge. Disposition is thus effectually made of any possible claim that error occurred at the time when counsel for the defense was interrupted in his opening address.

Immediately following the discussion in appellant's brief of the episode discussed above, quotation is made by appellant from the record and it is claimed that the court erred in a ruling included in the quotation. Appellant was on the witness-stand. He testified that he and his son, after a certain time, had remained in business together until "the

latter part of 1915, or the first part of 1916. I do not just recall the date. Q. And did differences arise between you? A. Yes, sir. Q. Leading to lawsuits? A. Yes, sir. Q. And what kind of business were you and Earle in? A. Well, we were into several kinds during that time. Q. Well, just tell us about them in your own way." Objection was made that this last question was immaterial and the objection was sustained. It is insisted that the ruling was error, but we think it was not. We do not see how it could have been material for appellant to tell about the several kinds of business in which he and his son had been engaged. If the question was intended as preliminary—and we fail to see how it could have been so intended—appellant shows nothing from the record which informed the trial court of the fact. The objection was properly sustained.

Appellant inserts in his brief the following quotation from the transcript of the evidence: "Q. Now, this lady was with you, and Earle came along; is that right? A. Yes, sir. Q. Now tell what happened on that occasion, what he did or said. Q. Well, I stopped him, as I had before, and dunned him for some money, and he gave me— [The District Attorney] : I move that be stricken out as immaterial, may it please the court. [Counsel for defendant] : I think now, if your Honor please—I can understand your Honor's ruling; I mean back in 1916; but here we are in the very year— The Court: It is not a question of remoteness. The deceased is not on trial. What he said other than by way of threats is immaterial. Just confine yourself to what your son said, if he said anything. A. He said. 'I've got no money, and if you don't lay off that money stuff it will be too bad for you.' " It is contended that the trial court here committed the same error which is claimed to have occurred at the time when the prosecutor halted, by objection, the opening statement made to the jury on behalf of appellant. The quotation we have just made from the brief is complete. It is not shown from the record that appellant's counsel stated to the court what he expected to show by the answer of appellant which was interrupted by the district attorney, to which, indeed, that officer might well have objected at the proper time that the witness had stated mere conclusions. It is true that the judge said, as he had remarked during the earlier episode, in effect, that what the

son said "other than by way of threats is immaterial". It will be remembered, however, that at the close of the occurrence, while counsel for appellant was addressing.the jury, the judge notified the advocate that his remark made at that time was not final, and that he might change his mind as the defense was developed. As to the particular time now under discussion, there ·is nothing in appellant's brief to show that counsel made any remonstrance as to the court's language with reference to threats, or that he then discussed the subject or asked leave, after the court had spoken, to discuss it. Indeed, counsel never at any time availed himself, so far as the brief shows, of the opportunity to present the point. When respective counsel and the court had their colloquy at the bench during the earlier episode, no authorities were presented to the judge upon the question involved in his statement as to a limitation upon the evidence to be introduced. It was the duty of counsel for the defense— nay, it was required of them if they desired to save the point—later to reopen the question and to present authorities to the court, if necessary. Judging from the portions of the record shown in the brief of appellant, his counsel tried the case, after the colloquy at the bench, as if he were entirely satisfied with the view of the judge upon the subject. Certainly, the court, so far as the brief shows, was never informed to the contrary.

Under the well-known rule that the burden is upon an appellant to show error before a judgment can be reversed, we have disposed of the claims of error above discussed. We shall not, however, permit matters so to rest. The case is pitiful from any view. It would be bad enough, from the standpoint of both father and son, if the killing occurred in self-defense. The case is pitiful to a degree if the father shot his son not in self-defense, as the jury determined. Furthermore, appellant is nearly seventy-three years of age. He was sentenced to imprisonment for life. Under all these circumstances we shall go further than the law requires in order to demonstrate that appellant was fairly tried.

We have said above that certain things do not appear in appellant's brief. One reason for a failure to show them in the brief is that they do not appear in the record. The two points last discussed above arose while appellant was on the witness-stand, and his very lengthy testimony in the record

we have perused with meticulous care. Counsel made no assertion that the query, "Well, just tell us about them in your own way," was preliminary to anything material which was expected to be shown by the defense, nor did he ever present to the trial court the question whether the judge was right in what he tentatively said, when the opening address of appellant's counsel to the jury was interrupted, concerning the limit to be placed upon testimony as to what was said throughout the years by the son of appellant. Moreover, not only does appellant's brief fail to show that the cause was not tried upon the theory that the trial court's remark made during the opening address of the defense to the jury was correct, but the record shows actually that it was so tried. This, not only because counsel failed to present at any time the question left open to them by the judge, but also because of specific situations shown by the record. First, when the court sustained the objection to the question, "Well, just tell us about them in your own way," the counsel who was examining appellant immediately went on: "All right. Then, Mr. Roberts, you and Earle severed your business relations, about the latter part of 1915 or the first part of 1916, is that right?" There was here an opportunity to test the question whether the court was right in saying that he thought the testimony concerning the son should be limited to a showing of threats, for appellant now assigns as error the sustaining of the objection which the court had just passed upon, on the theory that the judge was wrong. Nevertheless, with an "all right", counsel deserted the point. On another occasion appellant had spoken of a meeting with his son. His counsel then said, "Well, tell what was said on that occasion, Mr. Roberts." To this query the district attorney made the peculiar objection, "I object to the entire conversation, except that portion containing a threat," thus leaving the witness to determine for himself what part of the conversation "contained" a threat. However, without awaiting a ruling on the objection—and it never was ruled upon—counsel for appellant proceeded: "All right. What did he say, Mr. Roberts, on that occasion in the nature of a threat?"

On the whole, we think it unnecessary to decide whether the trial judge was wrong, when he said on two occasions

that the testimony concerning the son's utterances should be limited to a showing of threats. The trial, taking the entire record together, was conducted upon the theory that the judge was right. He never had an opportunity to rule upon the question.

■ Further, however, the testimony concerning the son and tending to show a feeling of animosity toward the father was not limited to a showing of threats made by the younger man, who, be it here observed, was at the time of his death forty-four or forty-five years of age. We shall recite the testimony of appellant upon the subject of the son's feeling of animosity, including, however, the threats made by the son, as a part of the entire picture. The recital will show what an extreme state of affairs was exhibited to the jury by the testimony of the father. These are the different sections of the testimony of appellant on the subject: Father and son entered into business together as contractors, and in other lines of endeavor, in 1910. They severed their business relations in "the latter part of 1915, or the first part of 1916". Then this appears: "Q. And did differences arise between you? A. Yes, sir. Q. Leading to lawsuits? A. Yes, sir." The witness was asked whether after the severance of their business affairs the relations between him and his son were friendly or unfriendly. "A. Unfriendly. Q. And did Earle ever make any threats against you? . . . A. Yes, sir." Father and son met on a road in Antelope Valley in "the latter part of 1916, it might have been the forepart of 1917". Each was driving a car. "I wanted to speak to him, so I stopped in the road and he attempted to go around me and got stalled in the sand and stopped. After he stopped I got out of my car and went over to near his car, and I asked him when he was going to pay me the money he had gotten out of the Lancaster Cattle Company. . . . I made a move towards him, knowing that he had a check-book in his pocket, and when I made that move toward him he pulled a gun out and pointed it at my head, and he said, 'If you come any nearer to me I will blow your brains out.' " Appellant then thought he "had better quit" and the two separated. In May of 1932, probably the 18th, a little more than two months before the killing, appellant waited for his son in the hall of the building in which the office of the latter was located. This was

shortly after 6 o'clock in the evening. ''I met him in the hall and I spoke to him about paying me some money, and he gave me the usual conversation, that he had no money. Of course, I couldn't agree with him, and then I took hold of his arm to lead him into his office. First, I asked him if he was going in his office, and he said no. I took him by the arm, and I thought I could turn him towards his office, and that he would go in there, and we would have some kind of a settlement, as I needed money awfully badly. He would not go in. And I guess I held his arm kind of tight, and he started to strike me and kicking me; and after he had kicked me a few times he reached into his coat pocket and pulled out a revolver and pointed it at me, and told me to stop. I did.'' About a week before the son was killed he and his father met in Pershing Square, in Los Angeles, across the street from which was situated the building where the son had his office. ''I stopped him; and I asked him when he was going to pay me some money; that I was hard up and that I had to have some; and he says, 'I am hard up, too, and I can't pay you any money.' '' After an interruption the witness gave the remark of the son, ''I have got no money, and if you don't lay off that money stuff I will fix you.'' This was probably upon the same occasion already referred to in this opinion, when somewhat similar language is ascribed to the son, although the record is not clear upon the subject. Father and son, for some time before the killing—the record is not clear as to the length of the period—repeatedly made engagements to meet and discuss their financial affairs, but the son did not meet the engagements. ''He would not keep an appointment with me.'' The feeling between the two was so strong that the father never visited the home of his son. The latter was married and had two daughters, one of seventeen and one of fourteen years. The father was in fear of his life, because of the son's animosity toward him, ''most of the time'' after ''about 1916 or 1917''.

In the face of such a deplorable showing as this, in the absence of any attempt on the part of appellant's counsel to show what in addition they expected to prove, and in default of attempt to present the legal question which the trial judge had left open, we can see no harm that could have resulted from what the judge said as to the limitation

which he thought should be placed upon the testimony of appellant concerning the utterances of the son. Anything more would have been but cumulative of the mass of almost unimaginable matter in the record. If appellant's counsel thought they were entitled under the law of evidence to present more testimony upon the subject they should have given the trial judge the opportunity to admit it.

After the case of the prosecution had been closed and after the defense had also rested, the district attorney asked leave to examine a witness whose testimony was logically a part of the main case for the People. Counsel for the defense objected to the testimony. The district attorney then said: "I might state to the court that this witness was unknown to us; and if counsel wants me to I can explain why the facts of this witness' testimony were unknown to us. Therefore, this not being a game, the People ask permission, in the interest of justice, to reopen the case for the purpose of receiving this witness' testimony." Appellant's counsel then argued in support of his objection and the district attorney further said: "I say to the court, as an officer of the court, that the People did not know of the significance of this witness' testimony until Saturday afternoon. It is as true as I am standing on this spot, and I can put on evidence to prove it if counsel doubts my word." The court then permitted the testimony to be given and it is now contended that the granting of the request was error. It is insisted that "more emphasis" was placed on the testimony by its late production than if it had gone in before the prosecution rested. We fail to see how any overemphasis was given the testimony, unless it was caused by the argument presented by counsel for the defense after the district attorney had made his first statement, and that emphasis was favorable to appellant. During the argument counsel said that it would be unfair to admit the testimony at the time. Section 1093 of the Penal Code provides, in effect, that after the testimony in chief of prosecution and defense in a criminal case has been received, "The parties may then offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, permit them to offer evidence upon their original case." Under this section we think the court properly allowed the introduction of

the belated testimony. The statements of the district attorney gave the court "good reason" for the course it took.

The next point made by appellant is argued under the heading "Exclusion of inquiries directed to show failure of experts to properly examine defendant." The inquiries thus referred to are not pointed out to us in the brief. We are not told to what experts they were addressed, nor are we referred to places in the transcript where the questions and objections to them may be found. After nearly three pages of argument, however, counsel do say: "The court excluded inquiries directed to the ascertainment whether there had been an organic change in the brain tissue, as the result of syphilis, which had produced insanity. The court ruled that, unless the defense intended to prove the existence of syphilis, these questions were improper." We shall proceed to discuss the point thus stated, without regard to the form or character of the questions which are supposed to have presented it to the trial court.

In order to aid in a determination of appellant's plea of not guilty by reason of insanity the trial judge appointed three alienists, and the district attorney one, to examine appellant and to testify concerning his state of mind. Three testified that he was sane, one that he was insane. The argument of appellant upon the question now under consideration is principally based upon portions of the testimony of one of the experts who was of the opinion that appellant was sane. This alienist, whom we shall call Dr. O., testified that the pupillary reflexes of appellant "were rather sluggish in their reaction to light". He also found an absence of "knee jerks" in his subject. He then observed, because of these conditions, that if appellant "were a private patient of mine I would advise them to have an examination" of the spinal fluid. He also testified: . . . [A]nd in order to be absolutely positive whether a person has syphilis you have to make what is known as a spinal puncture? A. You should. It is not 100 per cent accurate. Q. But good medical practice requires that you should do that? A. Yes. Q. And a spinal puncture test will show the germ of syphilis present or absent? A. That is what it is for. Sometimes it does not show even when it is present. I say that because very often they repeat it. The repeated examination will show what the first examination does not."

Immediately following the quotation from the testimony of Dr. O., appellant says that "with all due respect to the experts, they or any of them do not know whether the defendant has such degenerated condition of the brain tissues, from syphilis, as to produce insanity". Indeed, the entire burden of appellant's argument on the head now under consideration is that he was halted in attempts to inquire of some of the experts whether they had taken all the steps necessary to ascertain whether appellant was afflicted with syphilis. Further, that is the only subject dealt with during the portion of the examination of Dr. O., quoted in the brief, which covers about two and one-half printed pages. But the purpose of the experts was not to ascertain whether appellant was a syphilitic, but to ascertain whether he was legally insane. They were all qualified, of course, and the qualifications of none of them are disputed. Indeed, the qualifications of Dr. O. were admitted by appellant. Being qualified to testify as to the sanity or insanity of appellant, they were all incontrovertibly and necessarily qualified to conduct such an examination of appellant as would enable them to testify upon the ultimate question at issue under appellant's special plea. Three out of four of the experts, their qualifications not being disputed, examined appellant and testified that he was sane. In other words, the effect of the testimony of the experts was, whether he had syphilis or not, that he was sane. These observations would seem to answer the point made by appellant, although the instance of Dr. O., upon whose testimony the point is based, may be pointed to as a specific illustration of the situation. In addition to the testimony of the doctor, which we have mentioned above, he also said that "good medical practice requires" that a specimen of the spinal fluid should be taken in order to determine whether a patient is *afflicted with syphilis*. Nevertheless, as already observed, he testified that appellant was sane, although he had taken no such specimen. And he testified to that effect in no uncertain terms. He said that "he has always been sane. He never has been insane either medically or legally." The fact that the three experts were qualified, the fact that they made an examination of appellant, the fact that they swore that he was sane, all go together to show that the question whether or not he was a syphilitic was an immaterial point in the

case. It is perhaps well to observe here that there is no testimony in the record to the effect that appellant was afflicted with syphilis or that he had ever had the disease.

There was testimony that the father of appellant was insane during the latter part of his life and that at the time of his death and for a considerable period prior to that event he was confined in an institution devoted to the care of such unfortunates. A brother of appellant was a witness at the trial. This question was addressed to him: ''[C]an you tell us something of the particular symptoms or form of insanity that your father manifested?'' Objection was made that the question was immaterial and the objection was sustained. It is contended in the opening brief that this inquiry was properly addressed to the witness as an ''intimate acquaintance'' of his father. This contention is unsound for the reason that there is nothing in the testimony of the witness to show that he ever saw his father after he became insane. It is insisted in the reply brief that the question should have been allowed because the only objection was that it was immaterial. We think the objection was good. Certainly, the question was improper under the law, the witness not having qualified either as an expert or as an intimate acquaintance, and an answer to it could not properly have aided the jury. The trial judge would have been within his province if he had ruled the question to be improper, without objection. The trial of a lawsuit is not a game of chess, and no party, not even a defendant in a criminal case, is entitled to the testimony of a witness required by law to possess certain qualifications before he can testify, and who does not possess the qualifications. The crux of the entire present situation is shown by the question: How can a man testify as to the symptoms or form of insanity of a demented person whom he never saw after he became insane? In what we have said we do not decide that the particular inquiry now before us would be proper if addressed to one who was admittedly an intimate acquaintance of the person inquired about.

The defense produced a witness who was asked whether there had been a change in appellant's demeanor and actions at a certain period as compared with an earlier one. Two questions of this nature were answered without objection, and then came this: ''Q. Well, I mean with re-

spect to his mind, whether he was more preoccupied and had his mind more on himself than he had before?'' The question was objected to as calling for a conclusion of the witness. ''The Court: Objection sustained. Yes, it obviously calls for a conclusion.'' The ruling was proper.

■ Another witness, not an expert, was asked certain questions as to her acquaintance with appellant. She was then asked if she had formed ''any opinion as to his sanity or insanity''. The question was properly ruled out for the reason that the testimony of the witness, which we have read in full, failed to show that she was an intimate acquaintance of appellant. This is so plain that it is unnecessary to recite her testimony here.

Judgment and order affirmed.

STEPHENS, J., Concurring.—I concur.

I concur in the judgment but not in those parts of the main opinion wherein it is held that the attorney for defendant at the trial effectively consented to the court's ruling made in the offer of proof. ■ I think the point was reopened when the attorney offered to make a showing through the father's testimony of the son's statements to him of the personal relations existing between them but a short time before the tragedy. The court's remarks were anything but indefinite or tentative, concluding with, ''What he said other than by way of threats is immaterial. Just confine yourself to what your son said, if he said anything.'' While the attorney could have pressed the matter, the court's ruling was intimation enough that it cared for no argument or authority, and most certainly the attorney was under no pain of losing his exception by accepting the ruling as final in the trial.

Whether or not the court was right seems of little consequence in this appeal, for much testimony giving a very complete description of the father's and son's difficulties and mutual ill feelings reached the jury.

Craig, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 9, 1933, and the following opinion then rendered thereon:

WORKS, P. J.—In his petition for rehearing appellant treats the concurring opinion of Justice Stephens, joined in by Justice Craig, as if it brought something new into the case. This view is unsound. The effect of the concurring opinion was that the two justices agreed to everything contained in the opinion preceding their concurrence, with one exception. They dissented from what the writer of the main opinion had said to the effect that appellant had either waived or failed properly to present the question which was left open by the trial judge when the district attorney interrupted the opening address being made to the jury by appellant's counsel.

The main opinion took two grounds upon which its writer attempted to base the determination that it was not necessary to decide whether the trial judge erred in limiting testimony concerning the son of appellant to threats. It was as to one of these grounds that Justices Stephens and Craig dissented, and their dissent, of course, presented the law of the case upon the question. What the writer of the main opinion said upon the subject went for naught. The court determined, through the two dissentients, that the first reason assigned by the writer of the main opinion was not a tenable ground for refusing to decide whether the trial judge was in error in saying what he did, twice, as to the limitation to be placed upon the testimony concerning the son.

The second reason given by the writer of the main opinion for the declination to decide the point in question was that, despite what the court said and even though counsel for appellant did not give the court an opportunity to decide the point in question, the testimony went far, and went far enough, in showing the son's conduct other than threats. This state of affairs is fully set forth in the main opinion, and Justice Stephens, in writing his concurrence, referred to no part of the record except those parts stating the state of affairs referred to. This matter is here made clear because of the ground taken in the petition for rehearing. There were two trials of appellant, the first under his general plea of not guilty, which resulted in a verdict against him, the second under his special plea of not guilty by reason of insanity. It is obvious that no evidence taken at the second trial can work either to affect, uphold or overthrow the verdict which had already been rendered under the

general plea. It is said in the petition for rehearing that the evidence in the record as to the acts and conduct of the son, other than testimony as to his threats, is to be found in that part of the record made after the commencement of the trial under the plea of insanity. In making the assertion counsel are in error. All the evidence referred to in the main opinion, upon this particular question, was produced at the trial under the plea of not guilty. None of us had read, before the filing of the petition for rehearing, the testimony of appellant given upon the trial of the issue as to insanity.

As the writer of the main opinion still adheres to his early view upon the first ground he set down as a reason for not passing upon the correctness of the trial judge's two remarks as to the limitation to be placed upon the testimony concerning the son, he thinks it proper to say something more upon that subject. In his petition for rehearing appellant naturally seizes upon the remark in the concurring opinion that "the point was reopened when the attorney offered to make a showing through the father's testimony of the son's statements to him of the personal relations existing between them but a short time before the tragedy". Appellant then cites instances in support of this assertion. One of these is thus shown by the record: "Q. And what kind of business were you and Earle in? A. Well, we were into several kinds during that time. Q. Well, just tell us about them in your own way. [The District Attorney] : To which we object as immaterial. The Court: Objection sustained." This matter surely does not support the assertion contained in the concurring opinion. The objection was plainly good, as pointed out in the main opinion.

In the petition for rehearing appellant, in support of the language above quoted from the concurring opinion, also recites that portion of the record quoted in the main opinion, containing this: "The Court: It is not a question of remoteness. The deceased is not on trial. What he said other than by way of threats is immaterial. Just confine yourself to what your son said, if he said anything." Then came the answer of the witness, showing a threat by the son. There was nothing here to show that the judge had departed from the tentative view he had expressed just before the evidence

for the defense was opened. He had then left the question open, and appellant's counsel could not have been misled, by the court's latest remark, into a belief that it was no longer open, if the whole record be considered. During the entire trial appellant's counsel never asked a question to which objection was made, that raised the point. Not a single occurrence had taken place during the trial either to stiffen or to relax the judge's attitude assumed when the question first came up. The record is a blank upon the subject. There is no doubt, in the mind of the writer of the main opinion, from the early statement made by the trial judge, that he was ready at any time to have the point presented and discussed; nor, considering the whole record, could appellant's counsel have been misled to a contrary belief. As was remarked in the main opinion, the trial judge was never given an opportunity finally to pass upon the point.

Strange to say, appellant questions, in his petition for rehearing, the ruling of the trial court upon the following inquiry addressed to the brother of appellant: "[C]an you tell us something of the particular symptoms or form of insanity that your father manifested?" The question was immaterial, because one of that nature cannot be put to an "intimate acquaintance", as well as for the reasons assigned in our opinion. The statute provides that "evidence may be given upon a trial" of "the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given" (sec. 1870, Code Civ. Proc., subd. 10). The question above quoted asked neither for reasons upon which an opinion as to sanity might have been later expected, nor did it ask for the opinion itself. The insanity of the father was presupposed by the question, and under the statute there was nothing left for the witness to answer.

Rehearing denied.

CRAIG, J., and STEPHENS, J., Concurring.—We concur in the order denying a rehearing, but we adhere to the views expressed in our concurring opinion heretofore rendered.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 25, 1933.